1  **GUTRIDE SAFIER LLP**
   SETH A. SAFIER (State Bar No. 197427)
2  seth@gutridesafier.com
   Marie A. McCrary (State Bar No. 262670)
3  marie@gutridesafier.com
   100 Pine Street, Suite 1250
4  San Francisco, CA 94111
   Telephone: (415) 639-9090
5  Facsimile:  (415) 449-6469

6
7  Attorneys for Petitioner

8                    UNITED STATES DISTRICT COURT

9                  NORTHERN DISTRICT OF CALIFORNIA

10

11 VISHAL SHAH, an individual, on behalf      CASE NO.
   of himself, the general public, and those
12 similarly situated                          PETITION TO CONFIRM
                                               ARBITRATION AWARD
13      Petitioner,

14

15            v.

16 CONSTELLATION BRANDS, INC.,

17      Respondent.

18

19

20

21

22

23

24

25

26

27

28

Petition to Confirm Arbitration Award

**INTRODUCTION**

1.     Petitioner Vishal Shah, by and through his undersigned counsel, brings this action to confirm an arbitral award against Respondent Constellation Brands, Inc. ("Constellation" or "Respondent") pursuant to Section 9 of the Federal Arbitration Act, 9 U.S.C. § 9. The arbitral award was made in the San Francisco office of the American Arbitration Association.

2.     For background, Petitioner's underlying claims concern Respondent's egregious privacy violation and breach of consumer trust in blatant violation of California law. Respondent owns and operates several websites, including, modelousa.com, discoverpacifico.com, casanoble.com, frescamixed.com, and coronausa.com (the "Websites"), which allow visitors to, among other things, view and order Respondent's products. Like most internet websites, Respondent designed the Websites to include resources and programming scripts from third parties that enable those parties to place cookies and other similar tracking technologies on visitors' browsers and devices and/or transmit cookies along with user data.

3.     Unlike many internet websites, however, Respondent's Websites purport to offer all visiting consumers the choice to browse the Websites without being tracked, followed, and targeted by third party data brokers and advertisers. The Websites do this by displaying a pop-up cookie consent banner to Website visitors, which informs visitors that they can "Reject All" cookies including those used to "enhance user experience and to analyze performance and traffic" on the Website and those that "share information about your use of our site with our social media, advertising and analytics partners." An exemplar of Respondent's initial pop-up cookie banner on the Modelo Website[1], from 2023, is included below:



<hr />

[1] A substantially similar banner was displayed on each of the Websites.

4.    Many of the millions of visitors to Respondent's Websites, including Petitioner, did just that – they chose to "Reject All" cookies and proceeded to browse the Websites. Unfortunately, Respondent's privacy promises were outright lies, designed to lull users into a false sense of security. Unbeknownst to the users, and contrary to their express rejection of all such cookies, Respondent nonetheless caused cookies to be stored on the visitors' devices. In doing so, Respondent caused the transmission of users' personal data to undisclosed third parties, contrary to Respondent's representations.

5.    Many of the third-party cookies that Respondent wrongfully caused to be placed on Petitioner's and other consumers' devices are designed to track consumers' behavior across websites for marketing purposes. These third-party cookies can enable third parties to track and collect data in real time regarding Website visitors' behaviors and communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data. Third parties analyze and aggregate this user data across websites and time for their own purposes and financial gain, including, creating consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics; creating audience segments based on shared traits; and performing targeted advertising and marketing analytics. Further, the third parties share user data and/or user profiles to unknown parties to further their financial gain. This type of tracking and data sharing is exactly what Petitioner and the other consumers who rejected all cookies sought to avoid. In disregarding Petitioner and the Websites visitors' express refusal to consent to such cookies, Respondent violated state statutes and its common law duties to Petitioner and those visitors to the Websites.

6.    Prior to asserting claims on behalf of himself and a class of similarly harmed individuals, Petitioner obtained an arbitral award finding that Petitioner is not subject to Respondent's arbitration and class action waiver provisions in the Modelo Website's Terms & Conditions. Petitioner now seeks to confirm that arbitral award so that he can pursue class claims against Respondent for its breach of consumer trust and wanton privacy violations.

Petition to Confirm Arbitration Award

**PARTIES**

7.      Petitioner Vishal Shah is, and at all times alleged herein was, an individual and a resident of San Jose, California. Petitioner intends to remain in California and makes his permanent home there.

8.      Respondent Constellation Brands, Inc. is a Delaware corporation with its principal place of business in Victor, New York. Constellation has substantial contacts with and receives substantial benefits and income from California and throughout the United States.

**JURISDICTION AND VENUE**

9.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Petitioner and Respondent, and the amount in controversy (that is, the value of the arbitral award), exclusive of interest and costs, exceeds $75,000.

10.     As set forth in the arbitral award (*see* Exhibit A), Petitioner is not subject to Respondent's website Terms & Conditions. Petitioner thus may assert claims in court on behalf of a putative class, for Respondent's privacy violations, misrepresentations, unjust enrichment, and trespass to chattels. Such a class action would seek injunctive relief as well as statutory damages of $5,000 *per violation* (and there were numerous violations, occurring each time Respondent caused the placement or transmission of third-party cookies on a Website visitor's device or browser after that person had declined such cookies on Respondent's Websites), punitive damages, compensatory damages and/or restitution. Accordingly, the value of the award—finding that Petitioner is not limited to an individual arbitration—exceeds $75,000.

11.     This Court has personal jurisdiction over Respondent for the limited purpose of confirming the arbitration award because Respondent agreed to arbitrate in San Francisco, California, and fully participated in the arbitration in San Francisco, thereby consenting to jurisdiction in California and purposefully availing itself of the privilege of conducting activities (and, in particular, litigating the issues decided in the award) in California. This petition arises out of Respondent's arbitration activities in California, and it is reasonable for the Court to exercise jurisdiction over Respondent for purposes of confirming the award.

1
2
3
4
5
6

12.     In addition, Respondent regularly conducts and/or solicits business in, engages in other persistent courses of conduct in, and/or derives substantial revenue from products and services provided to persons in the State of California. Respondent has engaged, and continues to engage, in substantial and continuous business practices in the State of California. California's long-arm statute permits the exercise of jurisdiction to the limits of due process. *See* Cal. Civ. Proc. Code § 410.10.

7
8
9
10
11
12
13

13.     Venue is proper in this District pursuant to 9 U.S.C.S. § 9, which provides that "[i]f no court is specified in the agreement of the parties, then such application may be made to the United States court in and for the district within which such award was made." Here, the parties agreed to arbitrate gateway issues of arbitrability in San Francisco, there was no pre-dispute agreement between the parties specifying where the award must be confirmed, and the arbitration was held and the award was made in the San Francisco office of the American Arbitration Association.

14
15
16

14.     Venue is also proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events (that is, the arbitration) giving rise to this Petition occurred within this District.

17

15.     Petitioner accordingly alleges that jurisdiction and venue are proper in this Court.

18

## **LEGAL STANDARD**

19
20
21
22
23
24
25
26
27

16.     Confirmation of an arbitration award "is a summary proceeding that converts a final arbitration award into a judgment of the court." *Ministry of Def. & Support v. Cubic Def. Sys.*, 665 F.3d 1091, 1094 n.1 (9th Cir. 2011); *accord Int'l Petroleum Prods. & Additives Co. v. Black Gold, S.A.R.L.*, 418 F. Supp. 3d 481, 487 (N.D. Cal. 2019). Judicial review of an arbitration award, including on arbitrability issues, is both limited and highly deferential. *PowerAgent Inc. v. Elec. Data Sys. Corp.*, 358 F.3d 1187, 1193 (9th Cir. 2004). "Neither erroneous legal conclusions nor unsubstantiated factual findings justify federal court review" of an arbitration award under the Federal Arbitration Act ("FAA"). *Kyocera Corp. v. Prudential-Bache T Servs.*, 341 F.3d 987, 994 (9th Cir. 2003) (en banc).

28

17.     Under 9 U.S.C. § 10(a), there are only four, extremely limited grounds to vacate an arbitration award:

- where the award was procured by corruption, fraud, or undue means;

- where there was evident partiality or corruption in the arbitrators, or either of them;

- where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or

- where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

18.     In addition, the "burden of establishing grounds for vacating an arbitration award is on the party seeking [vacatur]." *U.S. Life Ins. Co. v. Superior Nat'l Ins. Co.*, 591 F.3d 1167, 1173 (9th Cir. 2010).

## SUBSTANTIVE ALLEGATIONS

19.     On December 12, 2023, Petitioner filed a demand for arbitration in San Francisco with the American Arbitration Association. Exhibit B.

20.     Arbitrator David Handsher was assigned as the arbitrator.

21.     Following an initial conference, the Arbitrator ordered briefing regarding his jurisdiction and arbitrability. *See* Exhibit A.

22.     After receiving briefing and supporting evidence from the parties, the Arbitrator issued a final order/award, dated October 2, 2024, concluding: (a) he had authority to decide threshold arbitrability issues; (b) Petitioner did not manifest consent to the agreement to arbitrate; (c) Petitioner is not estopped from challenging arbitrability of the dispute; and (d) Petitioner is not bound by the arbitration agreement. Exhibit A.

23.     The AAA subsequently issued a closing letter, dated November 13, 2024, confirming that it had closed the arbitration as dismissed. Exhibit C.

24.     The FAA provides that a court "must" confirm an arbitration award if any party to the arbitration applies for an order confirming the award within one year after the award is made, "unless the award is vacated, modified, or corrected." 9 U.S.C. § 9.

25.     The award was not procured by corruption, fraud, or undue means.

26.     There was no evident partiality or corruption in the arbitrator.

27.     The arbitrator was not guilty of any misconduct in refusing to postpone a hearing, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior prejudicial to the rights of Respondent.

28.     The arbitrator did not exceed his powers, or so imperfectly execute them that a mutual, final, and definite award upon the subject matter submitted was not made.

29.     Because the award has not been vacated and there is no ground to vacate the award, it must be confirmed.

**PRAYER FOR RELIEF**

WHEREFORE, Petitioner respectfully requests that the Court confirm the arbitral award, and provide Petitioner with any further relief as the Court deems proper.

Dated:      February 7, 2025          **GUTRIDE SAFIER LLP**

*/s/Seth A. Safier/s/*
Seth A. Safier, Esq.
100 Pine Street, Suite 1250
San Francisco, CA 94111

Petition to Confirm Arbitration Award

# EXHIBIT A

## AMERICAN ARBITRATION ASSOCIATION

| | | |
|---|---|---|
| In the Matter of Arbitration Between | ) | |
| | ) | |
| VISHAL SHAH | ) | 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-7588 |
| Claimant, | ) | |
| and | ) | |
| | ) | |
| CONSTELLATION BRANDS, INC. | ) | |
| Respondent. | ) | |
| | ) | |

### DECISION ON CLAIMANT'S MOTION REGARDING
### NON-ARBITRABILITY OF DISPUTE

**Appearances**


**For Claimant:**

Seth A. Safier, Esq.
Gutride Safier LLP
100 Pine Street, Suite 1250
San Francisco, CA  94111
Seth@gutridesafier.com


**For Respondent:**

Edward D. Totino, Esq.
Baker McKenzie LLP
10250 Constellation Boulevard, Suite 1850
Los Angeles, CA  90067
edward.totino@bakermckenzie.com




October 2, 2024

1

During the Preliminary Management Hearing Conference, held on July 16, 2024, Claimant raised the jurisdictional issue as to whether the dispute was arbitrable under applicable law and requested that the parties brief the jurisdictional question prior to setting additional dates. This request was granted. This constitutes the Arbitrator's decision on Claimant's Motion.

## I. The Basic Issues

1. Based on the placement and arrangement of the "Terms & Conditions" hyperlink on Respondent's website, was Claimant deprived of actual notice of the agreement or denied reasonable notice of the terms of the contract, such that he did not manifest consent to the agreement to arbitrate and that he should not be so bound in litigating his concerns?

2. Is the Claimant estopped from raising the issue of arbitrability because he commenced arbitration under the provisions of Terms and Conditions that contain the agreement to arbitrate?

## II. Background

Respondent Constellation owns and operates the website ("the Website") that allows users to search for and view content regarding Modelo alcohol beverages and related products. The Website was integrated with third parties, who place small text files ("cookies") on the user's device which allow companies to track and record the user's communications when visiting websites. This enables data collection, behavior profiling and targeted advertising. The Website provides users the opportunity to "Reject All" or "Accept Cookies." Claimant alleges that he chose the option "Reject All" cookies, yet the third party cookies were placed on his device despite his expressed choice.

According to his complaint, at the time of Claimant's use of the website there was a banner that provides the user the choice regarding the cookies described above Below

the banner was a rectangular box with capital letters "ENTER."  Below that rectangle, in

much smaller font was the following:

"Modelo supports the Century Council's fight against underage drinking and drunk driving
learn more, visit their website at www.centurycouncil.org
Our Privacy Notice and Terms & Conditions have changed.  By using this website, you agree to
the Privacy Policy and Terms and Conditions of use."

On a following page to this notation is another rectangular box including the word

"Modelo" and below that in small type:

"You must be of legal drinking age to enter this site.

Please enter your date of birth below and press 'Enter.'"

Below this notation is "MM (MONTH), DD (DAY), YYYY (YEAR)" in larger type.  Below that

is a rectangle with the word "ENTER."  The appreareance of the word "ENTER"is essentially

identical to the word "ENTER" that followed the choice of cookies.

On December 12, 2023, Claimant filed with AAA a Demand for Arbitration, Statement of

Claim with an attached Complaint and a copy of the Terms and Conditions which contain the

Agreement to Mandatory Arbitration.  The Terms and Conditions include the following:

"THESE TERMS AND CONDITIONS INCLUDE AN AGREEMENT TO MANDATORY
ARBITRATION, WHICH MEANS THAT YOU AGREE TO SUBMIT ANY DISPUTE
RELATED TO THE WEBSITE OR OUR SERVICES TO BINDING INDIVIDUAL
ARBITRATION RATHER THAN PROCEEDING IN COURT.

THE DISPUTE RESOLUTION PROVISION ALSO INCLUDES A CLASS ACTION
WAIVER, WHICH MEANS THAT YOU AGREE TO PROCEED WITH ANY DISPUTE
INDIVIDUALLY AND NOT AS PART OF A CLASS ACTION.

THESE TERMS AND CONDITIONS ALSO INCLUDE A JURY WAIVER.

MORE INFORMATION ABOUT THE ARBITRATION, CLASS ACTION WAIVER, AND
JURY WAIVER CAN BE FOUND IN THE ARBITRATION AGREEMENT, CLASS ACTION
WAIVER, AND JURY WAIVER SECTION BELOW."

3

The following language is contained in the Arbitration Agreement, Class Action Waiver

and Jury Waiver at pages 4 and 5 of the Terms and Conditions:

"**Mandatory Binding Arbitration.**  The parties to these Terms and Conditions agree that final
and binding arbitration on an individual basis shall be the sole and exclusive forum and remedy
for any and all disputes and claims that cannot be resolved informally and that relate in any way
to or arise out of our service, this Website or these Terms and Conditions. The parties hereto
acknowledge and agree that the Federal Arbitration Act and federal arbitration law apply to
arbitrations under these Terms and Conditions (despite any other choice of law provision).

Arbitration under these Terms and Conditions shall be conducted by the American Arbitration
Association (the "AAA"). For claims of less than or equal to $75,000 (exclusive of attorney's
fees, costs, and alleged punitive damages or penalties), the AAA's Consumer Arbitration Rules
will apply; for claims over $75,000, the AAA's Commercial Arbitration Rules will apply. The
AAA rules are available at https://www.adr.org.  Any Notice of Arbitration should be mailed to
us at the following address:  Constellation Brands, Inc. 207 High Point Drive, Building 100,
Victor, NY 14564 Attn: Legal Department.

**Class Action Waiver.**  TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW,
ARBITRATION SHALL PROCEED SOLELY ON AN INDIVIDUAL BASIS WITHOUT THE
RIGHT FOR ANY DISPUTES TO BE ARBITRATED ON A CLASS ACTION BASIS OR ON
BASES INVOLVING CLAIMS BROUGHT IN A PURPORTED REPRESENTATIVE
CAPACITY ON BEHALF OF OTHERS. Disputes may not be joined or consolidated unless
agreed to in writing by all parties. No arbitration award or decision will have any preclusive
effect as to issues or claims in any dispute with anyone who is not a named party to the
arbitration. In the event that this CLASS ACTION WAIVER is deemed unenforceable, then any
putative class action may only proceed in a court of competent jurisdiction WITHOUT A JURY
and not in arbitration.

**Waiver of Rights, Including to Trial by Jury.**  By agreeing to arbitration, the parties
understand and agree that they are waiving their rights to maintain other available resolution
processes, such as a court action or administrative proceeding, to settle their disputes. The rules
in arbitration are different. There is no judge or jury, and review of an arbitrator's decision is
very limited. BOTH PARTIES FURTHER AGREE THAT, WHETHER A CLAIM WILL BE
RESOLVED IN ARBITRATION OR IN COURT, THE PARTIES BOTH WAIVE ANY RIGHT
TO A JURY TRIAL INVOLVING ANY CLAIMS OR DISPUTES."

As noted earlier, Claimant did not raise the question of arbitrability until the Preliminary

Management Hearing Conference, held on July 16, 2024.

**III. Argument of the Parties**

<u>Claimant</u>

Claimant asserts that he did not, in fact, agree to the Terms and Conditions, which contained the Agreement to Arbitrate.  He states that he did not actively agree or exercise  free choice to agree to the terms, nor did he reasonably suspect his actions caused Respondent to infer his assent.  Claimant argues that there was no "click wrap" or "click through" assent which would include his indicating his agreement after being presented with the Terms and Conditions. He also argues that there was no "browse wrap" assent (where use of the website indicates assent where the Terms and Conditions are conspicuously posted on website).  Here, he argues, the hyperlink to the Terms and Conditions was not readily apparent and that his assent cannot be presumed and that the contract contained in the Terms and Conditions cannot be enforced.

<u>Respondent</u>

Respondent questions whether Claimant can voluntarily invoke arbitration with AAA (thereby conceding jurisdiction)  and now asks that entity (this arbitrator), to rule dispositively that it has no jurisdiction.  Respondent argues that Claimant demonstrated actual notice and accepted the Terms and Agreements by invoking arbitration under the agreement contained therein.  It asserts that Claimant should be estopped from arguing this jurisdictional question before AAA, that the proper forum for such an argument is in a court in response to a motion to compel arbitration.  Responent argues further that the website provided reasonably conspicuous notice and to the extent that there is any doubt on this issue there should be an evidentiary hearing where Claimant can be examined and corss-examined.  Finally, Respondent asserts that if the arbitrator accepts that no contract was entered, he has no power to rule on anything and that

the case should be dismissed with no substantive ruling.

**IV. Discussion**

I find that the placement of the Terms and Conditions was both confusing and relatively hidden, such that Claimant did not actively know of or consent to its terms, including the Agreement to Arbitrate contained within, prior to his usage of Respondent's website. This finding is based on an objective view of the website in question, which reasonably supports Claimant's contention that he used the website without knowledge of the Terms and Condtions.

The link to the Terms and Agreement was printed in fine print at the bottom of the page under a large ENTER notation. However, the meaning of the ENTER button was not defined. It was not clear to if clicking the ENTER button took the user to the website or whether the ENTER button pertained to the acceptance/rejection of cookies choice given just above it. A similar ENTER button appears later where a prospective user of the website enters his birth date to confirm a minimum qualifying age to enter the alcohol-related website. This adds further confusion as to what needed to be done to actually enter and engage with the website. It is clear that the placement and use of the ENTER button was intended to and/or had the effect of confusing a potential user.

Moreover, the Terms and Conditions link in fine print at the bottom of the page appeared after other messaging in the same fine print. This had the effect of hiding the Terms and Conditions link and makes it reasonably likely that a first-time user of the website would not be alerted to its existence prior to entering the website.

I conclude that Claimant was deprived of actual notice of the agreement or denied reasonable notice of the terms of the contract, such that he did not manifest consent to the

agreement to arbitrate and that he should not be so bound in litigating his concerns.  I find that the asserted contractual relationship between the parties was obviated by the absence of a meaningful choice on the part of Claimant and that any asserted contract was unconscionable and should not be enforced against Claimant.   I further find that Claimant is not estopped from raising the issue of an unconscionable contractual relationship.  The issue of the validity of the underlying contractual relationship between the parties is a traditional determination made by an arbitrator and can be made at any point in the proceedings, absent restrictive language in an otherwise binding agreement.

However, where this decision leaves the parties is not clear.  It will be a court of appropriate jurisdiction rather than an arbitrator, upon a motion to confirm or challenge this arbitral decision, that will ultimately determine the issue of the validity and effect of the purported agreement of the parties.

## V. Conclusion

The Claim is dismissed.  The Claimant did not manifest consent to the Agreement to Arbitrate when he first engaged with the Website.  He should not be bound by the Agreement to Arbitrate in litigating his concerns.   It is the conclusion of this arbitrator, that the purported Agreement to Arbitrate was the product of an absence of meaningful choice by the Claimant and should not be enforced against him.


October 2, 2024                                                    *David Handsher*
DATED                                                              David Handsher, Arbitrator

7

# EXHIBIT B

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**GUTRIDE SAFIER LLP**
Seth A. Safier (State Bar No. 197427)
  seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
  marie@gutridesafier.com
Todd Kennedy (State Bar No. 250267)
  todd@gutridesafier.com
Kali R. Backer (State Bar No. 342492)
  kali@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone:  (415) 639-9090
Facsimile:  (415) 449-6469

*Attorneys for Claimant*

## AMERICAN ARBITRATION ASSOCIATION

## SAN FRANCISCO REGIONAL OFFICE

| | |
|---|---|
| VISHAL SHAH, an individual, on behalf of himself, the general public, and those similarly situated,<br><br>          Claimant,<br><br>     v.<br><br>CONSTELLATION BRANDS, INC.,<br><br>          Respondent. | Arbitration Case No.<br><br>**COMPLAINT AND DEMAND FOR ARBITRATION** |

Claimant Vishal Shah ("Claimant" or "Mr. Shah") brings this action on behalf of himself, the general public, and all others similarly situated against Constellation Brands, Inc. ("Respondent" or "Constellation").[1] Claimant's allegations against Respondent are based upon information and belief and upon investigation of Claimant's counsel, except for allegations specifically pertaining to Claimant, which are based upon Claimant's personal knowledge.

## **INTRODUCTION**

1.     This Complaint and Arbitration Demand concerns an egregious privacy violation and total breach of consumer trust in blatant violation of California law. Respondent's several websites (specifically, modelousa.com, discoverpacifico.com, casanoble.com, frescamixed.com,

---

[1] Claimant files this Complaint and Arbitration Demand without waiver of any right or argument, including without limitation, that he did not assent to Respondent's arbitration agreement and/or that the purported arbitration agreement is unlawful/unenforceable.

and coronausa.com; collectively referred to as the "Websites") are configured to use a multitude of cookies to enable third parties to track users' activity and communications on the Websites. Respondent, at all times relevant to the allegations of this Complaint, presented all visitors to the Websites with a pop-up banner that gave them the option to "Reject All" cookies. Thousands of visitors to these Websites did just that—they rejected all cookies and proceeded to browse the Websites. But, unbeknownst to them, and contrary to the express rejection of ***all cookies***, Respondent nonetheless caused cookies—both from Respondent and third parties with notorious privacy records, including from Facebook, Turn, and Google, among others—to be stored on the device and browser of Claimant and those similarly situated. In doing so, Respondent caused the transmission of broad swaths of data about Claimant, and those similarly situated, to undisclosed third parties, contrary to Respondent's representations and Claimant's and other consumers' express directions.

2.      Many of the third-party cookies that Respondent wrongfully placed on Claimant's and other consumers' devices and browsers are designed to track consumers' behavior across websites for marketing purposes. They are invasive because they allow third parties to track and collect, among other things: the URLs being browsed by consumers as well as the referrer URL; webpage title; webpage keywords; buttons the consumers click; the exact date and time of the website visits; consumers' devices, browsers, and IP addresses; product page visits; and/or data entered by Claimant into forms on the Website.

3.      Respondent allowed these companies access to Claimant's and other consumers' communications with Respondent and enabled them to collect data on consumers for use for their own purposes, including building profiles of consumers' interests and targeting advertising to them. This type of monitoring and data sharing is exactly what the consumers who opted out sought to avoid. Despite receiving notice of consumers' declination of consent, Respondent

COMPLAINT AND DEMAND FOR ARBITRATION

defied it and violated privacy statutes, state consumer protection statutes, tort duties, and also breached its contractual duties with Claimant and those similarly situated.[2]

## PARTIES

4.      Claimant Vishal Shah is, and was at all relevant times, an individual and resident of California.

5.      Respondent Constellation Brands, Inc. is a Delaware corporation with its principal place of business in Victor, New York.

## SUBSTANTIVE ALLEGATIONS

6.      Respondent Constellation Brands is an international producer and marketer of beer, wine, and spirits. Respondent owns and operates the Websites, which allow visitors to, among other things, search for and view content related to Respondent's products.

7.      Respondent owns and operates separate and distinct websites for its several product lines. At issue in this Complaint and Demand for Arbitration are its websites for Modelo beer (at modelousa.com, the "Modelo Website"), Pacifico beer (at discoverpacifico.com, the "Pacifico Website"), Casa Noble tequila (at casanoble.com, the "Casa Website"), Fresca Mixed cocktails (at frescamixed.com, the "Fresca Website"), and Corona beer (at coronausa.com, the "Corona Website").

8.      Respondent chose to integrate each of these Websites with cookies from third parties which, among other things, track users' behavior on the Websites.

9.      Cookies are small text files that website servers can cause to be placed on an internet user's device when that user's browser interacts with the website through its servers. First-party cookies are those that are placed on the user's browser directly by the webserver with which the user is knowingly communicating (in this case, any and all of these Websites). Third-party cookies are those that are set by other webservers (e.g. facebook.com, google.com, etc.). When a consumer visits any of the Websites, both first-party cookies and third-party cookies are

---

[2] Claimant has not included class allegations in this Complaint and Demand but reserves the right to do so in an amended complaint once the Arbitrator has decided all threshold issues related to this Arbitration, including without limitation jurisdiction, scope, and applicability.

placed on that consumer's devices. All of this is caused by software code that Respondent incorporates into its Websites, or that Respondent causes to be loaded. Because Respondent controls the software code of its Websites, it has complete control over whether first-party and third-party cookies are set on its users' devices.

10.     Third-party cookies, including those on the Websites, are typically designed to enable companies to track and record an Internet user's communications with and activities when visiting Internet websites. Third-party cookies typically work in furtherance of data collection, analytics, behavior profiling, and targeted advertising.

11.     Cookies are the backbone of digital advertising. Because cookies enable third parties to track users' behavior across the Internet and correlate data collected to specific users, advertisers and purveyors of websites can gain deep understanding of users' behavioral traits and characteristics and target those users with advertisements tailored to their profiles.

12.     As a research director at the Electronic Frontier Foundation put it, third-party cookies, such as those from Meta Platforms, Inc., formerly known as Facebook, Inc., allow these companies "to be a silent third-party watching whatever you're doing."[3]

13.     Every website is hosted by a server that sends and receives communications with Internet users and their web browsers to display web pages on users' devices.

14.     Users communicate with websites by sending HTTP requests, such as "GET" or "POST" requests. For example, when a user clicks on a hyperlink within a website, the user sends an HTTP request to the server hosting the website to which the user is sending the communication. The HTTP request command tells the website server what information is being requested and instructs the website's server to send the information back to the user.

15.     When a website has third-party cookies, those cookies are simultaneously placed on the user's device and browser. This allows the third-party cookie company to track the Internet user's communication with the website and to correlate the user with data such as the

---

[3] Jefferson Graham, Facebook spies on us but not by recording our calls. Here's how the social network knows everything, USA Today (March 4, 2020 4:52 am), https://www.usatoday.com/story/tech/2020/03/04/facebook-not-recording-our-calls-but-has-other-ways-snoop/4795519002/.

URLs being browsed by the user; the webpage title; button clicks; photo and video views; and the date and time of the website visit.

**A.    Respondent's Cookie Pop Up Banner Falsely Informed Consumers They May "Reject All" Cookies.**

16.    When users visit the Websites, each Website immediately displays a cookie pop up banner to every new user. As shown in the screenshot below, the pop up banner stated that "This website uses cookies to enhance user experience and to analyze performance and traffic on our website. We may also share information about your use of our site with our social media, advertising and analytics partners." The banner provides users the opportunity to select "Accept Cookies" or "Reject All," as shown on Respondent's Modelo Website:



17.    Each of the Websites makes identical representations. The Pacifico Website, Casa Website, Fresca Website, and Corona Website all feature the same scheme of prominently displaying a cookie pop up banner proclaiming that users can "Reject All" cookies, as shown in the following screenshots:

a. From the Pacifico Website:



b. From the Casa Website:



c. From the Fresca Website:

COMPLAINT AND DEMAND FOR ARBITRATION

1
2
3
4
5
6
7
8



9  d. From the Corona Website:



10
11
12
13
14
15
16
17
18
19
20

21    18.    The cookie banners on the Websites cause reasonable users to believe that, by

22  pressing the "Reject All" button, they could opt out of *all* third-party and other cookies and that

23  their communications with Respondent would remain private and not be shared with other third-

24  parties. They also believed that by pressing the "Reject All" button, Respondent would not share

25  information about their use of the Websites with social media, advertising and analytics third-

26  parties. Those beliefs, however, were false.

27    19.    In truth, Respondent does not abide by its users' wishes. Even though Respondent

28  received notice that certain users did not consent to third-party and other cookies when they click

the "Reject All" button, Respondent nonetheless places third-party tracking and other cookies on the devices of all users who visit the Websites—*even for those users who selected the "Reject All" button*.

20.    In particular, when users clicked the "Reject All" button on the cookies banner and opted out of cookies, Respondent nonetheless continued to cause third-party cookie data to be transmitted to and from consumers' devices, including from Facebook, Turn, and Google, among many others.

21.    The following screenshot shows some of the cookies utilized and placed on a user's device after that user clicked the "Reject All" button:



22.    Along with the cookie data, the Websites cause a large amount of other data to be sent to third parties. This data includes, among other things: the URLs being browsed by consumers as well as the referrer URL; webpage title; webpage keywords; button clicks; the exact date and time of the website visits; the IP address of consumers' devices; device and browser type; consumers' geolocation; product page visits; and data consumers supply to the Website, such as data entered into forms on the Website; and often identifier data. The identifier

data sent to the third party with this information allows that third party to correlate the data to the user or the user's device. As such, third parties can (and almost invariably do) use it to develop and enrich profiles on consumers to target advertising to them.

23.    The cookies on these Websites enable third parties like Meta Platforms, Inc., formerly known as Facebook, Inc., to link individual users and devices with data regarding specific browsing activity on the Website.

24.    The Meta cookies include the user's Facebook User ID—a unique identifier that Meta assigns to every person who signs up for a Facebook account. The Facebook User ID allows Meta to correlate data received alongside its cookies, such as the URLs of content requested, with the specific user. This occurs despite Respondent's knowledge that it does not have users' consent to utilize Facebook cookies to do so.

25.    The cookies that Respondent wrongfully places on users' devices enable third parties to track users' browsing history on any the Websites. Every time a user visits a new page on the Websites, even after declining cookies, more data regarding users' browsing activity is sent to third parties, alongside the cookie data. Meta, for instance, receives a call when a user clicks on a new webpage on the Respondents' Websites, even if the user rejects all cookies. The call transmits the URL of the webpage visited, which includes the name of the webpage visited, and the users' assigned Facebook User ID simultaneously to Meta.

**B.    Third Parties Exploit Data Received from the Cookies on the Website**.

26.    The more a user interacts with the Website, the more data third parties amass about the user. The third-party cookies that Respondent wrongfully allows to be stored on users' devices and browsers enable third parties to compile a vast repository of users' browsing histories and to receive access to information that is otherwise unknowable. These third parties leverage the information collected to their advantage, as they use it to compile browsing histories and habits into personal profiles on consumers, like Claimant, which are sold to advertisers to generate revenue and target advertising to users like Claimant. In particular, third-party cookies, such as those from these Websites, allow third parties to draw inferences from information collected about users' browsing and search history on the Websites to create profiles about

consumers reflecting the consumer's preferences, characteristics, psychological trends, predispositions, behavior, attitudes, intelligence, abilities, and aptitudes.

27.     For example, Meta cookies that are transmitted when users visit the Websites similarly enable Meta to collect data about users' browsing activities and attribute it to individual users, thus creating a dossier about the individual.

28.     The data that the third-party cookie companies collect is valuable to Respondent as well. Data about users' browsing history enables Respondent to spot patterns in users' behavior on the Websites and their interests in, among other things, specific products.

29.     Meta, for instance, uses the data it collects through the Facebook cookies to provide its marketing partners, like Respondent, with insights about their users' activities and allows them the ability to track users' actions and define custom audiences to reach people likely to be interested in their business.

**C.     The Intercepted Data Is Valuable.**

30.     The information that the third-party cookie companies intercept, collect, and track about users through the third-party cookies Respondent causes to be placed on users' devices carries significant economic value. Legal scholars observe that "[p]ersonal information is an important currency in the new millennium." *See* Paul M. Schwartz, *Property, Privacy and Personal Data*, 117 Harv. L. Rev. 2055, 2056–57 (2004). Indeed, "[t]he monetary value of personal data is large and still growing, and corporate America is moving quickly to profit from the trend." *Id*. "Companies view this information as a corporate asset and have invested heavily in software that facilitates the collection of consumer information." *Id*.

31.     The value of the users' personal information provided to third parties through the cookies Respondent wrongfully placed can be quantified. For instance, in one study, researchers evaluated the value that 180 internet users placed on keeping personal data secure. Participants valued web browsing history at $52.00 per year. Similarly, they valued web search history at $57.00 per year.



32.    The value of user-correlated web browsing history can be quantified because companies are willing to pay users for the exact type of data that the third parties here intercepted and collected (without permission) through the cookies on the Website. For example, Google Inc. had a panel called "Google Screenwise Trends" which, according to Google, is designed "to learn more about how everyday people use the Internet."

33.    As part of the program, Google had panelists add a browser extension that shares with Google the sites that users visit and how the panelist uses them. The panelists consented to Google tracking this information for one of a number of "gifts," including gift cards to retailers such as Barnes & Noble, Walmart, and Overstock.com.

34.    After three months, Google also agreed to pay panelists additional gift cards "for staying with" the panel. These gift cards, mostly valued at $5, demonstrated conclusively that internet industry participants understood the enormous value in internet users' browsing habits. Google subsequently chose to pay Screenwise users up to $3 per week to be tracked.

35.    Other platforms have appeared where consumers can and do directly monetize their own data. For instance, Killi is a data exchange platform that allows consumers to own and

COMPLAINT AND DEMAND FOR ARBITRATION

earn income from their data.[4] Similarly, BIGtoken "is a platform to own and earn from your data. You can use the BIGtoken application to manage your digital data and identity and earn rewards when your data is purchased."[5]

36.    The Nielsen Company is another example. It has extended its reach to computers and mobile devices through Nielsen Computer and Mobile Panel. By installing the application on users' computers, phones, tablets, e-readers, or other mobile devices, Nielsen tracks users' activity and enters users into sweepstakes with monetary benefits, in which users  earn points worth up to $50 per month.[6]

37.    Technology companies recognize the monetary value of users' sensitive, personal information, insofar as they encourage users to install applications explicitly for the purpose of selling that information to technology companies in exchange for monetary benefits.[7]

38.    The California Consumer Privacy Act ("CCPA") recognizes that consumers' personal data is a property right. Not only does the CCPA prohibit covered businesses from discriminating against consumers that opt-out of data collection, the CCPA also expressly provides that: "[a] business may offer financial incentives, including payments to consumers as compensation, for the collection of personal information, the sale of personal information, or the deletion of personal information." Cal. Civ. Code § 1798.125(b)(1). The CCPA provides that, "[a] business shall not use financial incentive practices that are unjust, unreasonable, coercive, or usurious in nature." Cal. Civ. Code § 1798.125(b)(4).

---

[4] https://killi.io/about-us/
[5] https://bigtoken.com/faq#general_0 ("Third-party applications and sites access BIGtoken to learn more about their consumers and earn revenue from data sales made through their platforms. Our BIG promise: all data acquisition is secure and transparent, with consumers made fully aware of how their data is used and who has access to it.").
[6] Kevin Mercandante, Ten Apps for Selling Your Data for Cash, Best Wallet Hacks (June 10, 2020), https://wallethacks.com/apps-for-selling-your-data/.
[7] Kari Paul, Google launches app that will pay users for their data, The Guardian (June 11, 2019), https://www.theguardian.com/technology/2019/jun/11/facebook-user-data-app-privacy-study; Saheli Roy Choudhury and Ryan Browne, Facebook pays teens to install an app that could collect all kinds of data, CNBC (Jan. 30, 2019), https://www.cnbc.com/2019/01/29/facebook-paying-users-to-install-app-to-collect-data-techcrunch.html; Jay Peters, Facebook will now pay you for your voice recordings, The Verge (Feb. 20, 2020), https://www.theverge.com/2020/2/20/21145584/facebook-pay-record-voice-speech-recognition-viewpoints-proununciations-app.

39.     Through its false representations and unlawful data collection and dissemination, Respondent is unjustly enriching itself at the cost of consumer choice, when the consumer would otherwise have the ability to choose how they could monetize their own data.

### CLAIMANT'S EXPERIENCES

40.     During the last year, Claimant visited the Modelo Website and viewed content available on the Modelo Website.

41.     When Claimant visited the Modelo Website, he was presented with a cookie banner and was given the option to click a button reading "Reject All."

42.     Consistent with Claimant's typical practice, Claimant clicked on the "Reject All" button and opted out of "All" cookies, indicating his choice/agreement to reject all cookies. Respondent's cookie banner led Claimant, and those similarly situated, to believe that they had declined or rejected "All" cookies.

43.     Claimant believed that opting out of "All" cookies would keep his communications with the Modelo Website private.

44.     By opting out of and/or rejecting "All" cookies, Claimant gave Respondent notice that he did not consent to the placement of cookies from the Modelo Website. In reliance on Respondent's representations and promises, only then did Claimant continue browsing the Modelo Website.

45.     Despite the fact that the cookie banner made it appear to Claimant that he had rejected/opted out of "All" cookies, unbeknownst to him, Respondent nonetheless continued to cause the placement of cookies, including those from Facebook, Turn, and Google, along with others, on his device. In doing so, Respondent caused the transmission of private communications and data to third parties as Claimant browsed the Modelo Website.

46.     Respondent's representations that consumers could opt out of or reject cookies was untrue. Had Claimant known this fact, he would not have used the Modelo Website. Moreover, Claimant reviewed the cookie banner prior to using the Modelo Website. Had Respondent disclosed that it would continue to cause cookies to be stored on consumers' devices even when they choose to "Reject All" cookies, Claimant would have noticed it and would not

have used the Modelo Website or, at a minimum, would have interacted with the Modelo Website differently.

47.    Claimant continues to desire to browse the Modelo Website and would like to browse other, similar websites (including the other Websites), but only those that do not misrepresent that users can "Reject All" cookies. If the Modelo Website was reconfigured to honor users' request to "Reject All" cookies, Claimant would likely browse the Modelo Website again in the future but will not do so until then. Claimant regularly visits websites that feature content similar to that of the Modelo Website. Because Claimant does not know how the Modelo Website is configured, which can change over time, and cannot test whether the Modelo Website honors users' requests to "Reject All" cookies, Claimant will be unable to rely on Respondent's representations when browsing the Modelo Website in the future absent an injunction that prohibits Respondent from making misrepresentations on its Modelo Website and other Websites.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**Invasion of Privacy Under California's Constitution**

48.    Claimant realleges and incorporates the paragraphs of this Complaint as if set forth herein.

49.    California's constitution creates a right to privacy, and further creates a right of action against private entities such as Respondent.

50.    The principal purpose of this constitutional right is to protect against unnecessary information gathering, use, and dissemination by public and private entities, including Respondent.

51.    Article I, Section 1 of the California Constitution provides:

"All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property and pursuing and obtaining safety, happiness, and privacy."

52. The phrase "and privacy" was added in 1972 after voters approved a proposed legislative constitutional amendment designated as Proposition 11. Proposition 11 was intended to curb businesses' control over the unauthorized collection and use of peoples' personal information, as the ballot argument stated:

> The right of privacy is the right to be left alone...It prevents government and business interests from collecting and stockpiling unnecessary information about us and from misusing information gathered for one purpose in order to serve other purposes or to embarrass us. Fundamental to our privacy is the ability to control circulation of personal information. This is essential to social relationships and personal freedom.[8]

53. This amended constitutional provision addresses the concern over accelerating encroachment on personal freedom and security caused by increasing surveillance and data collection activity in contemporary society. Its proponents meant to afford individuals more measure of protection against this most modern threat to personal privacy:

> Computerization of records makes it possible to create 'cradle-to-grave' profiles of every American. At present there are no effective restraints on the information activities of government and business. This amendment creates a legal and enforceable right of privacy for every Californian.[9]

54. In recognizing these privacy rights, the California Constitution provides insight into and serves to define the nature of the reasonable expectation of privacy of an objectively reasonable California resident.

55. To plead a California constitutional privacy claim, Claimant must show an invasion of (i) a legally protected privacy interest; (ii) where Claimant had a reasonable expectation of privacy in the circumstances; and (iii) conduct by the Respondent constituting a serious invasion of privacy.

56. Respondent has intruded upon the following legally protected privacy interests of Claimant: (i) the California Invasion of Privacy Act, as alleged herein; (ii) the California Constitution, which guarantees Californians the right to privacy; (iii) the California Wiretap Acts

---

[8] Ballot Pamp., Proposed Stats. & Amends. To Cal. Const. With Arguments to Voters. Gen. Election *26 (Nov. 7, 1972).
[9] *Id.*

as alleged herein; (iv) Cal. Penal Code § 484(a) which prohibits the knowing theft or defrauding of property "by any false or fraudulent representation or pretense;" and (v) Claimant's Fourth Amendment right to privacy. Claimant has a reasonable expectation of privacy in the conduct of his life, including his internet browsing activities and in the electronic communications and exchange of personal data with Respondent, since, among other things, Respondent affirmatively promised Claimant that he could reject all cookies. Claimant directed his electronic devices to access the Modelo Website, and when he was presented with cookies banner on the Modelo Website, he reasonably expected that his rejection of all cookies would be honored. That is, he reasonably believed that Respondent would not cause the placement of such cookies on his device while he browsed the Website. Claimant also reasonably expected that, if he rejected "All" cookies, Respondent would not share his communications and data with third parties or collect such data itself. Claimant further reasonably expected that the Modelo Website would not cause his browser to store and send cookies and other data to third parties, which then uses that data to track Claimant's activity, such as the URLs being browsed by Claimant as well as the referrer URL; webpage title; webpage keywords; the exact date and time of the Modelo Website visits; the IP address of Claimant's computer; product page visits; and/or data that Claimant supplied to the Websites. Such information is "personal information" under California law, which defines personal information as including "Internet or other electronic network activity information," such as "browsing history, search history, and information regarding a consumer's interaction with an internet website, application, or advertisement." Cal. Civ. Code § 1798.140.

57. Respondent, in violation of Claimant's reasonable expectation of privacy, allows third-party cookie companies to collect, track and compile their web browsing activity and communications. The data that Respondent allows third parties to collect enables third parties, such as Meta, to assemble comprehensive profiles of Claimant's life. Those profiles are, and can be, used to further invade Claimant's privacy, by, *inter alia*, allowing third parties to learn intimate details of Claimant's life, and target him for advertising and other purposes, as described

herein, thereby harming Claimant through the abrogation of Claimant' autonomy and ability to control dissemination and use of information about himself.

58.     Respondent's actions constituted a serious invasion of privacy in that it invaded a zone of privacy protected by the Fourth Amendment (i.e., one's personal communications), and violated criminal laws on wiretapping and invasion of privacy. These acts constitute an egregious breach of social norms that is highly offensive.

59.     Respondent's intrusion into Claimant's privacy was also highly offensive to a reasonable person in that Respondent violated criminal and civil laws designed to protect individual privacy and against theft.

60.     The surreptitious and unauthorized disclosure of the internet activity and communications of thousands, if not millions, of consumers constitutes an egregious breach of social norms.

61.     Respondent lacked a legitimate business interest in causing the placement of third-party cookies that allowed third-party companies, including marketing, advertising, and social media companies, to track, intercept, receive, and collect data about users and their browsing history without their consent.

62.     Claimant has been damaged by Respondent's invasion of his privacy and is entitled to just compensation, including disgorgement of profits related to the unlawful tracking, and injunctive relief.

## SECOND CAUSE OF ACTION

### Violation of the California Invasion of Privacy Act

### California Penal Code § 631

63.     Claimant realleges and incorporates by reference all paragraphs alleged herein.

64.     California Penal Code § 631(a) provides, in pertinent part:

"Any person who, by means of any machine, instrument, or contrivance, or in any other manner . . . willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so

obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars . . . ."

65.    To establish liability under § 631(a), a Claimant need only establish that a Respondent, "by means of any machine, instrument, contrivance, or in any other manner," did any of the following:

Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,

Or

Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,

Or

Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,

Or

Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

(Cal. Penal Code § 631(a).)

66.    Respondent is a "person" within the meaning of California Penal Code § 631.

67.    Under § 631(a), Respondent must show it had the consent of all parties to a communication.

68.    Respondent did not have the consent of all parties to learn the contents of or record Claimant's private communications. Respondent also did not have consent to allow third parties to learn the contents of or record Claimant's private communications.

69.    Respondent utilizes software code on its Websites, including the Modelo Website, that allows third parties to intercept Claimant's private communications and web activity on these Websites.

70.    The Websites cause the user's browser to store cookies from third parties, and to transmit those cookies alongside other data—such as button clicks, and specific URL visits—to the third party. By configuring the Websites in this manner, Respondent intentionally accessed, intercepted, read, learned, and/or collected the electronic communications of Claimant, and aided and abetted the third-party cookie companies, including Facebook, Turn, and Google, among many others, to access, intercept, read, learn, and/or collect the electronic communications of Claimant as well.

71.    Section 631(a) is not limited to phone lines, but also applies to "new technologies," such as computers, the Internet, and email. *See Matera v. Google* Inc., 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *Bradley v. Google, Inc.*, 2006 WL 3798134, at *5–6 (N.D. Cal. Dec. 22, 2006) (CIPA governs "electronic communications"); *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589 (9th Cir. 2020) (reversing dismissal of CIPA and common law privacy claims based on Facebook's collection of consumers' Internet browsing history).

72.    The following items constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA (and, even if they do not, Respondent's deliberate and purposeful scheme that facilitated the interceptions falls under the broad statutory catch-all category of "any other manner"): (i) the Websites, including the software code modules therein that are designed to cause the transmission of consumers' communications and web activity to third-parties; (ii) the third-party cookies on the Websites; (iii) Respondent's computer servers, including the software code modules installed on and/or served by those servers used to place cookies and/or intercept, aid and abet others to intercept, receive, transmit, read, track, and analyze Claimant's communications; and (iv) the plan Respondent carried out to place cookies and/or intercept, aid and abet others to intercept, collect, transmit, read, and track Claimant's communications, even though Claimant explicitly declined such actions (collectively, the "Constellation Instruments").

73.    The private communications that were intercepted, collected, transmitted, received, tracked, and analyzed by the "machine[s], instrument[s], or contrivance[s]" alleged above included, the following:

- internet IP address of the consumer's device;

- the URLs being browsed by the consumer as well as the referrer URL;

- the title of webpage viewed;

- webpage keywords;

- the exact date and time of the website visits;

- device identifiers;

- Facebook User ID; and

- Data entered into forms on the Websites;

(Collectively, the information listed in the bullet points above shall be referred to as "Private Communications.")

74.    By enabling the Constellation Instruments to intercept, collect, transmit, receive, track, and analyze Claimant's Private Communications without Claimant's consent, and by aiding and abetting third parties to intercept, collect, transmit, receive, track and analyze the Private Communications, Respondent violated Section 631(a) of the Privacy Act. In particular, Respondent:

- intentionally tapped, electrically or otherwise, the lines and/or instruments of internet communication being used by consumers like Claimant to access the Websites;

- intentionally made unauthorized connections, electrically or otherwise, with the lines and/or instruments of internet communication being used by consumers like Claimant to access the Websites and allowed third parties to do so;

- willfully, and without the consent of consumers like Claimant, read and learned the contents and/or meaning of Claimant's messages and communications containing Private Communications, while the same was in transit or passing over lines of internet communication, or was being sent from and received at locations in California and allowed third parties to do so;

- used Claimant's Private Communications to increase Respondent's profits;

• allowed third parties to intercept, collect, transmit, receive, track, and analyze Claimant's Private Communications; and

• aided, agreed with, and conspired with other persons (including, without limitation, Meta, Turn, Google, and other third-party cookie companies) to unlawfully do, permit, and cause to be done the above-listed activities.

75. Claimant has suffered loss by reason of these violations, including, but not limited to, (i) violation of his right to privacy; and (ii) loss of value in his Private Communications.

76. Unless enjoined, Respondent will continue to commit the illegal acts alleged here. Claimant continues to be at risk because Claimant frequently uses the Internet to search for information and content related to Respondent's products. Claimant continues to desire to use the Internet for that purpose. Claimant has no practical way to know if his request to decline cookies will be honored and/or whether his actions on the Websites will be monitored or recorded by Respondent and/or third-party cookie companies.

77. Claimant seeks all relief available under the California Invasion of Privacy Act, including injunctive relief and statutory damages.

### **THIRD CAUSE OF ACTION**

**Violation of the California Invasion of Privacy Act**

**California Penal Code § 635**

78. Claimant realleges and incorporates by reference all paragraphs alleged herein.

79. The California Invasion of Privacy Act, codified at Cal. Penal Code §§ 630 to 638, includes the following statement of purpose:

> The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.

80. California Penal Code § 635 provides as follows:

> Every person who manufactures, assembles, sells, offers for sale, advertises for sale, possesses, transports, imports, or furnishes to another any device which is primarily or exclusively designed or intended for eavesdropping upon the

communication of another, or any device which is primarily or exclusively designed or intended for the unauthorized interception or reception of communications between cellular radio telephones or between a cellular radio telephone and a landline telephone in violation of Section 632.5, or communications between cordless telephones or between a cordless telephone and a landline telephone in violation of Section 632.6 , shall be punished by a fine not exceeding two thousand five hundred dollars.

81.     Respondent intentionally manufactured, assembled, sold, offered for sale, advertised for sale, possessed, transported, imported, and/or furnished one or more wiretap devices (i.e., the Constellation Instruments, including the software code modules therein) primarily or exclusively designed or intended for eavesdropping upon the communication of another (i.e., Claimant).

82.     In particular, the Constellation Instruments contain software code modules that are primarily or exclusively designed to enable third parties to intercept, collect, transmit, receive, and track communications that users reasonably (but erroneously) believed would be sent directly and exclusively to Respondent. Further, although Claimant intended to reject and/or opt out of "all" cookies, the software code modules of the Constellation Instruments were designed to (and in fact did) cause the placement of cookies and software code which were used to intercept, collect, transmit, receive, track, analyze, and sell users' Private Communications to third parties.

83.     Claimant did not consent to any of Respondent's actions in implementing the wiretaps.

84.     Claimant has suffered loss by reason of these violations, including, but not limited to, (i) violation of his right to privacy; and (ii) loss of value in his Private Communications.

85.     Unless enjoined, Respondent will continue to commit the illegal acts alleged here. Claimant continues to be at risk because he frequently uses the Internet to view content related to Respondent's products. Claimant continues to desire to use the Internet for that purpose. Claimant has no practical way to know if his request to decline cookies will be honored and/or whether his actions on the Modelo Website, or other Websites, will be monitored or recorded by Respondent and/or third parties.

86. Claimant seeks all relief available to him and the general public under the California Invasion of Privacy Act, including injunctive relief and statutory damages.

## FOURTH CAUSE OF ACTION

**Violation of the California Comprehensive Computer Data Access and Fraud Act**

**California Penal Code § 502**

87. Claimant realleges and incorporates by reference all paragraphs alleged herein.

88. Cal. Penal Code § 502 provides: "For purposes of bringing a civil or a criminal action under this section, a person who causes, by any means, the access of a computer, computer system, or computer network in one jurisdiction from another jurisdiction is deemed to have personally accessed the computer, computer system, or computer network in each jurisdiction." Devices with web browsers are "computers" within the meaning of the statute.

89. Respondent violated Cal. Penal Code § 502(c) by, among other things, (i) knowingly causing Claimant's and other users' computers to be accessed through third-party cookies and third-party software code that causes the transmission of users' data to be transmitted to third party cookie companies; (ii) knowingly accessing, and without permission using, Claimant's and other users' data and computers to devise or execute any scheme or artifice to defraud and/or deceive, and wrongfully obtain data; and (iii) knowingly accessing, and without permission making use of, data from Claimant and other users' computers as well as allowing third parties to do so.

90. Despite Respondent's false representations to the contrary, Respondent was unjustly enriched by acquiring Claimant's sensitive and valuable personal information without permission and using it for Respondent's own financial benefit. Claimant retains a stake in the profits Respondent earned from Claimant's personal browsing history and other data because, under the circumstances, it is unjust for Respondent to retain those profits.

91. Respondent allowed third parties and itself to access, copy, take, analyze, and use data from Claimant's devices while he was in the State of California. Accordingly, Respondent is deemed to have accessed Claimant's devices in California.

92.    As a direct and proximate result of Respondent's unlawful conduct within the meaning of Cal. Penal Code § 502, Respondent has caused loss to Claimant and has been unjustly enriched.

93.    Claimant seeks compensatory damages and/or disgorgement, and declarative, injunctive, or other equitable relief.

94.    Claimant is entitled to punitive or exemplary damages pursuant to Cal. Penal Code § 502(e)(4) because Respondent's violations were willful and, upon information and belief, Respondent is guilty of oppression, fraud, or malice as defined in Cal. Civil Code § 3294.

95.    Claimant is also entitled to recover reasonable attorneys' fees pursuant to Cal. Penal Code § 502(e).

## FIFTH CAUSE OF ACTION

### Violation of the California False Advertising Law,

### Cal. Bus. & Prof. Code §§ 17500, *et seq.* ("FAL")

96.    Claimant realleges and incorporates by reference all paragraphs alleged herein.

97.    Beginning at an exact date unknown to Claimant, but within four (4) years preceding the filing of the Complaint, Respondent, with the intent to directly or indirectly perform services, or to induce members of the public to enter into obligations relating thereto, made or disseminated or caused to be made or disseminated before the public and Claimant statements concerning such services, or matters of fact connected with the performance thereof, which were untrue or misleading, and which Respondent knew, or in the exercise of reasonable care should have known, were untrue or misleading, in violation of the FAL. In particular, Respondent made untrue, false, deceptive, and/or misleading statements in connection with its cookies banner.

98.    Respondent's cookie banner asserts facts about its services that are untrue and likely to deceive and mislead the public and reasonable consumers. In particular, Respondent made representations and statements (by omission and commission) that consumers could "Reject All" cookies. This representation led reasonable customers to believe that they could reject all cookies and, in doing so, Respondent would not cause the placement of cookies on

consumers' devices and browsers, nor could third parties collect, receive, intercept, and compile data about users' browsing activity and Private Communications from the Websites in general and the Modelo Website in particular. Respondent had a duty to disclose that, despite consumers' election to reject cookies, the Websites would nonetheless cause the user's browser to store cookies and send data to third parties, who can then use that data to track the user's activity.

99.     Claimant, and those similarly situated, relied to their detriment on Respondent's false, misleading, and deceptive advertising and marketing practices, including each of the misrepresentations and omissions set forth above. Relying on Respondent's misrepresentations about its services, specifically its false and misleading representation that users could "Reject All" cookies, Claimant used the Modelo Website.

100.    Respondent's actions caused damage to and loss of Claimant's property right to control the dissemination and use of Claimant's personal information and communications.

101.    Respondent's representation that consumers could "Reject All" cookies if they selected that option on the cookie pop up banner was untrue. Again, had Claimant known these facts, he would not have used the Modelo Website. Moreover, Claimant reviewed the cookie banner prior to using the Modelo Website. Had Respondent disclosed that it causes cookies to be stored on consumers' devices even when they choose to "Reject All" cookies, Claimant would have noticed it and would not have used the Modelo Website.

102.    Respondent's acts and omissions are likely to deceive the general public.

103.    Respondent engaged in these false, misleading, and deceptive advertising and marketing practices to increase its profits. Respondents generated revenue by using the information wrongfully collected to, among other things, engage in targeted advertising.

104.    Accordingly, Respondent has engaged in false advertising, as defined and prohibited by Section 17500, *et seq.* of the California Business and Professions Code.

105.    The aforementioned practices, which Respondent used, and continues to use to its significant financial gain, also constitute unlawful competition and provide an unlawful advantage over Respondent's competitors as well as injury to the general public.

106.    Claimant has suffered an injury-in-fact, including the loss of money and/or property as a result of Respondent's unfair, deceptive, and/or unlawful practices, including the unauthorized disclosure and taking of their personal information which has value as demonstrated by the use and sale of consumers' browsing activity, as alleged above. Claimant has also suffered harm in the form of diminution of the value of his Private Communications and data.

107.    Respondent's actions caused damage to and loss of Claimant's property right to control the dissemination and use of his personal information and communications.

108.    Claimant seeks, on behalf of himself and those similarly situated, a declaration that the above-described practices constitute false, misleading and deceptive advertising.

109.    Claimant seeks full restitution of monies, as necessary and according to proof, to restore any and all monies acquired by Respondent from Claimant or those similarly situated by means of the false, misleading and deceptive advertising and marketing practices complained of herein, plus interest thereon.

110.    Claimant seeks, on behalf of himself and those similarly situated, an injunction to prohibit Respondent from continuing to engage in the false, misleading, and deceptive advertising and marketing practices complained of herein. Such misconduct by Respondent, unless and until enjoined and restrained, will continue to cause injury in fact to the general public and the loss of money and property in that Respondent will continue to violate the laws of California, unless specifically ordered to comply with the same. This expectation of future violations will require current and future consumers to repeatedly and continuously seek legal redress in order to recover monies paid to Respondent to which they are not entitled. Claimant, those similarly situated, and/or other consumers have no other adequate remedy at law to ensure future compliance with the California Business and Professions Code alleged to have been violated herein.

## SIXTH CAUSE OF ACTION

**Violation of the California Unfair Competition Law,**

**Cal. Bus. & Prof. Code §§ 17200, *et seq.* ("UCL")**

111.    Claimant realleges and incorporates by reference all paragraphs alleged herein.

112.    The UCL prohibits any "unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200. By engaging in the practices aforementioned, Respondent has violated the UCL.

113.    Respondent is a "person" under Cal. Bus. & Prof. Code § 17201.

114.    Respondent created and implemented a scheme to obtain and share the Private Communications and private web activity from web users through a pervasive pattern of false and misleading representations and omissions. Respondent misrepresented to Claimant and other web users that they could "Reject All" cookies when, in fact, Respondent caused cookies to be placed on consumers' devices and browsers, even after users rejected such cookies. Respondent concealed and failed to disclose to Claimant and other users that it would cause cookies and software code to be stored on consumers' devices and browsers which cause the interception and transmission of data about users' activity on the Websites in general, and the Modelo Website in particular, as well as Private Communications, to third parties and Respondent, despite users' clear refusal of such cookies. Further, Respondent failed to disclose to Claimant and web users that these third-party cookies enable third parties to track consumers' behavior across each of the Websites and use that data to compile profiles of consumers for targeted advertising and marketing purposes. In particular, the third-party cookies that Respondent wrongfully places on consumers' devices and browsers enable third parties and Respondent to track and collect consumers' Private Communications and browsing history on the Websites. With this information, third parties can (and almost invariably do) use it to develop and enrich profiles on consumers, like Claimant, to, among other things, target advertising to them.

115.    These representations and omissions were misleading and deceptive.

116.    Respondent's conduct was unfair and unconscionable, particularly because Respondent allowed third parties to intrude on communications that users reasonably believed to be private, and also because Respondent made their Private Communications available to third parties, despite representing that users of its Websites, and its Modelo Website in particular, could "Reject All" cookies.

117.    Respondent's    conduct    was    fraudulent    and    deceptive    because    the misrepresentations and omissions at issue were likely to, and in fact did, deceive reasonable consumers. Reasonable consumers, including Claimant, would have found it material to their decisions to use the Websites that Respondent would intercept, collect, transmit, receive, track, and analyze consumers' Private Communications without their consent, and make those Private Communications available to third parties via cookies despite Claimant's clear refusal of such cookies. Knowledge of these facts would have been a substantial factor in the consumers' decisions to use the Websites.

118.    Respondent's acts and practices constitute a continuing and ongoing unfair business activity defined by the UCL. Respondent's conduct is contrary to the public welfare as it transgresses civil and criminal statutes of the State of California designed to protect individuals' constitutional and statutory rights to privacy, violates established public policy, and has been pursued to attain an unjustified monetary advantage for Respondent by creating personal disadvantage and hardship to users of its Websites. As such, Respondent's business practices and acts have been immoral, unethical, oppressive, and unscrupulous, having caused injury to consumers far greater than any alleged countervailing benefit. Moreover, the harm to consumers, which includes the interception of their communications by third parties, the wrongful collection and tracking of consumers' Private Communications, and the construction of profiles about consumers that third parties and Respondent use for their monetary gain, far outweigh the value of Respondent's conduct (i.e., the wrongful placement of third-party cookies on consumers' devices and browsers even when consumers reject such cookies).

119.    Further, Respondent's "unfair" acts and practices include its violation of property, economic, and privacy interests protected by the statutes identified above. To establish liability under the unfair prong, Claimant need not establish that these statutes were actually violated, although the claims pleaded herein do so.

120.    Respondent owed Claimant a duty to disclose these facts because they were exclusively known and/or accessible to Respondent, who had superior knowledge of its activities with respect to the Private Communications of Claimant and users; because Respondent actively

concealed the facts; and because Respondent intended for consumers to rely on the omissions in question. Moreover, Respondent's omissions were contrary to representations that Respondent actually made to consumers that they could reject all cookies.

121.    Claimant and other users relied on Respondent's misrepresentations and omissions. Reasonable consumers would have relied on Respondent's promise to consumers that they could "Reject All" cookies and, in light of that promise, would have relied on the omissions, particularly because Respondent made representations to the contrary and consumers were not informed that Respondent would cause third-party cookies to be stored on consumers' devices and browsers, despite consumers' clear rejection of such third-party cookies.

122.    Respondent's conduct was also unlawful in that it violated the following statutes: the California Invasion of Privacy Act, Cal. Penal Code §§ 502, 630–638; the FAL; and the CLRA. Respondent's conduct also breached the promises Respondent made in its cookie banners.

123.    Moreover, Respondent's conduct was unlawful and violated California's Consumer Privacy Act, Cal. Civ. Code § 1798.100, *et seq.*, which sets strict standards regarding the collection, use, retention, sharing, and sale of "personal information," including but not limited to, §§ 1798.100(a), (b), (c), (e), 1798.110, 1798.115, 1798.120, 1798.130.

124.    For instance, Respondent violated Cal. Civ. Code § 1798.100(a) and § 1798.115 by (a) informing consumers that they could "Reject All" cookies but, nonetheless, caused such cookies to be placed on users' devices and browsers and caused the transmission of consumers' Private Communications when users rejected such cookies; (b) failing to inform consumers that third-parties would collect search key words; and (c) failing to inform consumers that third-party cookie companies would use data collected to compile profiles on consumers. Respondent further violated Cal. Civ. Code § 1798.100(e) because Respondent collects consumers' personal information and did not implement reasonable security procedures and practices appropriate to the nature of the personal information to protect the personal information from unauthorized or illegal access, destruction, use, modification, or disclosure in accordance with Cal. Civ. Code § 1798.81.5. Such security procedures Respondent could have implemented could have been to

1  simply honor consumers' requests to reject all cookies.

2      125.    Respondent also violated Cal. Civ. Code § 1798.120 because it received direction

3  from Claimant and other users not to sell their personal information when they chose to reject

4  all cookies, but Respondent nonetheless caused third-party cookies to be placed on Claimant and

5  other users' devices and browsers, thereby selling their Private Communications to third parties.

6      126.    Claimant has suffered an injury-in-fact, including the loss of money and/or

7  property as a result of Respondent's unfair, deceptive, and/or unlawful practices, including the

8  unauthorized disclosure and taking of his personal information which has value as demonstrated

9  by the use and sale of consumers' browsing activity, as alleged above. Claimant has also suffered

10  harm in the form of diminution of the value of his private and personally identifiable data and

11  content.

12      127.    Respondent's actions caused damage to and loss of Claimant's property right to

13  control the dissemination and use of his personal information and communications.

14      128.    Respondent's representation that consumers could "Reject All" cookies if they

15  selected to opt out of such cookies was untrue. Again, had Claimant known these facts, he would

16  not have used the Website. Moreover, Claimant reviewed the cookie banner prior to using the

17  Modelo Website. Had Respondent disclosed that it causes third-party cookies to be stored on

18  consumers' devices even when they choose to reject all cookies, Claimant would have noticed it

19  and would not have used the Modelo Website.

20      129.    The wrongful conduct alleged herein occurred, and continues to occur, in the

21  conduct of Respondent's business. Respondent's wrongful conduct is part of a pattern or

22  generalized course of conduct that is still perpetuated and repeated, in the State of California.

23      130.    Claimant, on behalf of himself and the general public, seeks restitution, injunctive

24  relief, and reasonable attorneys' fees, as well as any other relief deemed proper.

25              **SEVENTH CAUSE OF ACTION**

26        **Violation of the Consumers Legal Remedies Act**

27        **California Civil Code §§ 1750, *et seq.* ("CLRA")**

28      131.    Claimant realleges and incorporates by reference all paragraphs alleged herein.

132.    Respondent's actions, representations, and conduct described herein have violated, and continue to violate the CLRA, because they extend to transactions that are intended to result, or which have resulted, in the sale or lease of goods or services to consumers.

133.    Claimant and other users are "consumers" as that term is defined by the CLRA in California Civil Code § 1761(d).

134.    The Websites and Respondent's online platform services are "services" under the CLRA.

135.    Respondent's representations, set forth in this Complaint, led users of its Websites in general, and its Modelo Website in particular, to falsely believe that they could "Reject All" cookies and in doing so Respondent would not cause cookies and third-party software code to be placed on consumers' devices that cause the transmission of consumers' web activity and Private Communications to third parties and allow Respondent and third parties to track consumers' behavior on the Websites. By engaging in the actions, representations, and conduct set forth in this Complaint, Respondent has violated, and continues to violate, § 1770(a)(5), § 1770(a)(7), and § 1770(a)(9) of the CLRA.

136.    In violation of California Civil Code § 1770(a)(5), Respondent's acts and practices constitute improper representations that its Websites' services have sponsorship, approval, characteristics, uses, or benefits, which they do not have. In violation of California Civil Code § 1770(a)(7), Respondent's acts and practices constitute improper representations that its Websites are of a particular standard, quality, or grade, when they are of another. In violation of California Civil Code § 1770(a)(9), Respondent has advertised services with intent not to sell them as advertised.

137.    Claimant requests that Respondent be enjoined from continuing to employ the unlawful methods, acts, and practices alleged herein pursuant to California Civil Code § 1780(a)(2). If Respondent is not restrained from engaging in these types of practices in the future, Claimant and users will continue to suffer harm. Claimant and those similarly situated have no adequate remedy at law to stop Respondent's continuing practices.

138.    On or about August 18, 2023, Respondent was provided with notice and a demand to correct, or otherwise rectify the unlawful, unfair, false and/or deceptive practices complained of herein. Despite receiving the aforementioned notice and demand, Respondent failed to do so. Among other things, it failed to identify consumers, notify them of their right to remedies under the CLRA, and/or to provide that remedy. Accordingly, Claimant seeks, pursuant to California Civil Code § 1780(a)(3), compensatory damages, punitive damages, and restitution of any ill-gotten gains due to Respondent's acts and practices.

139.    Claimant also requests that he be awarded his costs and reasonable attorneys' fees pursuant to California Civil Code § 1780(d).

## **EIGHTH CAUSE OF ACTION**

### **Intrusion Upon Seclusion**

140.    Claimant realleges and incorporates by reference all paragraphs alleged herein.

141.    To assert a claim for intrusion upon seclusion, a Claimant must plead (i) that the Respondent intentionally intruded into a place, conversation, or matter as to which Claimant had a reasonable expectation of privacy; and (ii) that the intrusion was highly offensive to a reasonable person.

142.    By causing third-party cookies to be stored on consumers' devices, which enabled third parties to intercept, collect, transmit, receive, track, and analyze consumers' internet activity and Private Information in violation of Respondent's representation otherwise, Respondent intentionally intruded upon the solitude or seclusion of users. Respondent effectively placed third parties, including Meta, Turn, and Google, among many others, in the middle of communications to which they were not invited, welcomed, or authorized.

143.    The tracking and access caused by the cookies that Respondent caused to be stored on consumers' devices was not authorized by Claimant, and, in fact, Claimant specifically chose to reject cookies.

144.    Claimant had an objectively reasonable expectation of privacy surrounding his communications and web browsing activity on the Modelo Website based on Respondent's clear

and unequivocal promise that users could "Reject All" cookies, as well as state criminal and civil laws designed to protect individual privacy.

145.    Respondent's intentional intrusion into Claimant's internet communications and web browsing history would be highly offensive to a reasonable person given that Respondent represented that consumers could "Reject All" cookies when, in fact, it caused cookies to be stored on consumers' devices and browsers even when consumers rejected "All" cookies. Indeed, Claimant reasonably expected, based on Respondent's false representations, that Respondent would not cause third-party cookies to be stored on consumers' devices or cause the transmission of Claimant's Internet activities to third parties.

146.    Respondent's conduct was intentional and intruded on Claimant's communications which constitute private searches, web browsing activity, and other data.

147.    Claimant has been damaged as a direct and proximate result of Respondent's invasion of his privacy and is entitled to just compensation. Respondent's invasion of privacy caused Claimant to suffer damages, including but not limited to:

      a.    Nominal damages;

      b.    General damages for invasion of his privacy rights in an amount to be determined by a jury without reference to specific pecuniary harm;

      c.    Sensitive and confidential information that Claimant intended to remain private is no longer private; and

      d.    Respondent and the third-party cookie companies took something of value from Claimant and derived benefits therefrom without Claimant's knowledge or informed consent and without sharing the benefit of such value.

148.    Claimant seeks appropriate relief for that injury, including but not limited to, damages that will reasonably compensate him for the harm to his privacy interests as well as disgorgement of profits made by Respondent as a result of its intrusions upon Claimant's privacy.

<u>**NINTH CAUSE OF ACTION**</u>

**Breach of Contract**

149.   Claimant realleges and incorporates by reference all paragraphs alleged herein.

150.   Respondent's relationship with its users is governed by, among other documents, the Websites' cookie banners.

151.   The Websites' cookie banners, and the Modelo Website cookie banner in particular, contains enforceable promises that Respondent made to Claimant, including, but not limited to, the promise that Claimant and users of its Websites, including the Modelo Website, could "Reject All" cookies.

152.   Respondent breached this duty and violated this promise by causing third-party cookies and software code to be stored on consumers' devices and browsers that caused the transmission of Claimant's and other users' private web activity and Private Communications to third parties and Respondent, even though Respondent represented that Claimant could "Reject All" cookies and/or opt out of such cookies, and Claimant, in fact, chose to opt out of cookies by selecting the "Reject All" cookies button.

153.   Respondent further violated this promise because Respondent did not honor users' requests to opt out of the selling and sharing of online data through the use of cookies and similar technologies, as described above, and because Respondent shared users' information with third parties even when users did not consent to such sharing.

154.   At all relevant times and in all relevant ways, Claimant performed his obligations under the contract(s) in question or was excused from performance of such obligations through the unknown and unforeseen conduct of others.

155.   As a direct and proximate result of Respondent's breach of contract, Claimant did not receive the full benefit of the bargain, and instead received services from Respondent that were less valuable than described in their contract with Respondent. Claimant, therefore, was damaged in an amount at least equal to the difference in value between that which was promised and Respondent's partial, deficient, and/or defective performance.

156.   Respondent's breach caused Claimant the following damages:

a.      Nominal damages;

b.     The diminution in value of Claimant's personal information;

c.     The loss of privacy due to Respondent making sensitive and confidential information that Claimant intended to remain private no longer private;

d.     Respondent took something of value from Claimant and derived benefits therefrom without Claimant's knowledge or informed consent and without sharing the benefit of such value; and

e.     Claimant suffered an invasion of privacy. Claimant seeks compensatory damages for the invasion of his privacy.

157.   As a direct consequence of the breaches of contract and violations of the promises described above, Claimant seeks nominal damages, general damages, compensatory damages, consequential damages, unjust enrichment, and any other just relief.

<u>**TENTH CAUSE OF ACTION**</u>

**Breach of Implied Covenant of Good Faith and Fair Dealing**

158.   Claimant realleges and incorporates by reference all paragraphs alleged herein.

159.   Respondent's relationship with its users is governed by, among other documents, the Websites' cookie banners.

160.   The Websites' cookie banners contains enforceable promises that Respondent made to Claimant, including, but not limited to, the promise that Claimant and users of its Websites, including its Modelo Website, could "Reject All" cookies.

161.   Respondent breached this duty and violated this promise by causing third-party cookies and software code to be stored on consumers' devices and browsers that cause the transmission of Claimant's and other users' private web activity and Private Communications to third parties and Respondent, even though Respondent represented that Claimant could "Reject All" cookies and/or opt out of cookies, and Claimant, in fact, choose to opt out of cookies by selecting the "Reject All" cookies button.

162.   California law recognizes the implied covenant of good faith and fair dealing in every contract.

163.    In dealing between Respondent and its users, Respondent is invested with discretionary power affecting the rights of its users.

164.    Respondent purports to respect and protect its users' privacy.

165.    Despite its contractual promises to allow consumers to "Reject All" cookies, Respondent took actions outside that contractual promise to deprive Claimant of benefits of his contract with Respondent.

166.    Respondent's own tracking and its allowance of third parties to track and intercept internet communications was objectively unreasonable given its privacy promises.

167.    Respondent's unauthorized disclosure of users' personal information to Respondent was objectively unreasonable given Respondent's privacy promises.

168.    Respondent's conduct in tracking and causing third parties to intercept and track the internet communications of users who rejected all cookies evaded the spirit of the bargain made between Respondent and Claimant since it caused Claimant to surrender more data than he otherwise bargained for.

169.    As a result of Respondent's misconduct and breach of its duty of good faith and fair dealing, Claimant suffered damages. Claimant did not receive the benefit of the bargain for which he contracted and for which he paid valuable consideration in the form of his personal information, which, as alleged above, has ascertainable value.

170.    As a direct consequence of the breach of the implied covenant of good faith and fair dealing described above, Claimant seeks nominal damages, general damages, compensatory damages, consequential damages, and any other just relief.

## ELEVENTH CAUSE OF ACTION

### Common Law Fraud, Deceit and/or Misrepresentation

171.    Claimant realleges and incorporates by reference all paragraphs alleged herein.

172.    Respondent has fraudulently and deceptively informed Claimant that he could "Reject All" cookies when in fact Respondent causes third-party cookies and software code to be stored on users' devices—including Claimant's—that cause the transmission of Claimant's

private web activity and Private Communications to third parties and Respondent when consumers visit the Websites, even when consumers reject all such cookies.

173.    These misrepresentations and omissions were known exclusively to, and actively concealed by, Respondent, not reasonably known to Claimant, and material at the time they were made. Respondent knew or should have known how the Websites and cookies on the Websites functioned, through testing the Websites or otherwise, and knew or should have known that the Websites placed third party cookies on users' devices—including Claimant's— even after users attempted to opt out of such cookies. Respondent's misrepresentations and omissions concerned material facts that were essential to the analysis undertaken by Claimant as to whether to use the Modelo Website. In misleading Claimant and not so informing him, Respondent breached its duty to him. Respondent also gained financially from, and as a result of, its breach.

174.    Claimant relied to his detriment on Respondent's misrepresentations and fraudulent omissions.

175.    Claimant has suffered an injury-in-fact, including the loss of money and/or property as a result of Respondent's unfair, deceptive, and/or unlawful practices, including the unauthorized disclosure and taking of his personal information, which has value as demonstrated by the use and sale of consumers' browsing activity, as alleged above. Claimant has also suffered harm in the form of diminution of the value of his private and personally identifiable data and content.

176.    Respondent's actions caused damage to and loss of Claimant's property right to control the dissemination and use of his personal information and communications.

177.    Respondent's representation that consumers could "Reject All" cookies was untrue. Again, had Claimant known these facts, he would not have used the Modelo Website. Moreover, Claimant reviewed the cookie banner prior to using the Modelo Website. Had Respondent disclosed that it causes third-party cookies to be stored on consumers' devices even when they choose to "Reject All" cookies, Claimant would have noticed it and would not have used the Modelo Website.

178.    By and through such fraud, deceit, misrepresentations, and/or omissions, Respondent intended to induce Claimant, and those similarly situated, to alter their position to their detriment. Specifically, Respondent fraudulently and deceptively induced Claimant and those similarly situated to, without limitation, use the Website under the mistaken belief that Respondent would not collect data itself or share Claimant's personal data with third parties through the cookies when consumers chose to "Reject All" cookies.

179.    Claimant justifiably and reasonably relied on Respondent's misrepresentations and omissions, and, accordingly, was damaged by Respondent.

180.    As a direct and proximate result of Respondent's misrepresentations and/or omissions, Claimant has suffered damages, as alleged above.

181.    Respondent's conduct as described herein was wilful and malicious and was designed to maximize Respondent's profits even though Respondent knew that it would cause loss and harm to Claimant and other web users.

## **TWELFTH CAUSE OF ACTION**

### **Negligent Misrepresentation**

182.    Claimant realleges and incorporates by reference all paragraphs alleged herein.

183.    Respondent represented to Claimant a fact that was not true, namely, that users could reject all cookies by selecting the option to "Reject All" cookies on the cookie banner. In truth, Respondent caused third-party cookies and software code to be stored on consumers' devices and browsers which cause the transmission of users' private web activity and Private Communications to third parties and Respondent, even after users reject such cookies.

184.    These representations were material at the time they were made. They concerned material facts that were essential to the decisions of Claimant and other users regarding whether to visit and use the Websites.

185.    Respondent made identical misrepresentations and omissions to Claimant regarding users' ability to reject all cookies.

186.    Respondent should have known its representations were false, and that it had no reasonable grounds for believing them to be true when it made them.

187.    Respondent intended that Claimant and users of its Websites, including the Modelo Website, rely on the representations.

188.    By and through such negligent misrepresentations, Respondent intended to induce Claimant and those similarly situated to alter their positions to their detriment. Specifically, Respondent negligently induced Claimant, and those similarly situated, without limitation, to browse the Modelo Website under the mistaken belief that Respondent would not collect data itself or share Claimant's personal data with third parties when consumers chose to reject all cookies.

189.    Claimant, and those similarly situated, reasonably relied on Respondent's representations.

190.    Claimant, and those similarly situated, were harmed as set forth above.

191.    Claimant's, and those similarly situated's, reliance on Respondent's representation was a substantial factor in causing the harm.

## THIRTHEENTH CAUSE OF ACTION

### Trespass to Chattels

192.    Claimant realleges and incorporates by reference all paragraphs alleged herein.

193.    At all times relevant, Claimant owned, leased, and/or controlled his devices.

194.    Respondent, intentionally and without consent or other legal justification, caused cookies to be stored on Claimant's browsers and devices, which enabled third parties and Respondent to track Claimant's activity on the Modelo Website and use the data collected for their own advantage, as described above.

195.    Respondent was unjustly enriched as a result of its wrongful conduct, including through its misrepresentation that users could "Reject All" cookies and its failure to disclose that it causes third-party cookies and software code to be stored on consumers' devices and browsers, which cause the transmission of users' private web activity and Private Communications to third parties and Respondent, even when consumers reject such cookies.

196.    Respondent's intentional and unjustified placing of cookies designed to track Claimant's internet activities and actual tracking of Claimant's activities interfered with his use

of the following personal property owned by Claimant: (a) his computers and other electronic devices; and (b) his personally identifiable information.

197.    Respondent's trespass of Claimant's computing devices resulted in harm to Claimant and caused Claimant the following damages:

a.    Nominal damages for trespass;

b.    Reduction of storage, disk space, and performance of Claimant's devices; and

c.    Loss of value of Claimant's computing devices.

### FOURTEENTH CAUSE OF ACTION

#### Unjust Enrichment

198.    Claimant realleges and incorporates by reference all paragraphs alleged herein.

199.    Respondent created and implemented a scheme to increase its own profits through a pervasive pattern of false statements and fraudulent omissions.

200.    Respondent was unjustly enriched as a result of its wrongful conduct, including through its misrepresentation that users could "Reject All" cookies and its failure to disclose that it causes third-party cookies and software code to be stored on consumers' devices and browsers, which cause the transmission of users' private web activity and Private Communications to third parties and Respondent even when consumers reject such cookies.

201.    Respondent received a measurable benefit at the expense of Claimant in the form of the additional data Claimant surrendered at his expense.

202.    Respondent appreciated, recognized, and chose to accept the monetary benefits that Claimant conferred onto Respondent to his detriment. These benefits were the expected result of Respondent acting in its pecuniary interest at the expense of Claimant.

203.    It would be unjust for Respondent to retain the value of Claimant's property and any profits earned thereon.

204.    There is no justification for Respondent's enrichment. It would be inequitable, unconscionable, and unjust for Respondent to be permitted to retain these benefits because the benefits were procured as a result of its wrongful conduct. Claimant is entitled to restitution of

the benefits Respondent unjustly retained and/or any amounts necessary to return Claimant to the position he occupied prior to having his Private Communications obtained by Respondent.

## **PRAYER FOR RELIEF**

WHEREFORE, reserving all rights, Claimant respectfully requests judgment against Respondent as follows:

A.  An award of compensatory damages, including statutory damages where available, to Claimant against Respondent for all damages sustained as a result of Respondent's wrongdoing, including both pre- and post-judgment interest thereon;

B.  An order for full restitution;

C.  An order requiring Respondent to disgorge revenues and profits wrongfully obtained;

D.  An order temporarily and permanently enjoining Respondent from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

E.  For reasonable attorneys' fees and the costs of suit incurred; and

F.  For such further relief as may be just and proper.

Dated: December __, 2023

**GUTRIDE SAFIER LLP**

*/s/ Seth A. Safier/s/*
Seth A. Safier (State Bar No. 197427)
  seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
  marie@gutridesafier.com
Todd Kennedy (State Bar No. 250267)
  todd@gutridesafier.com
Kali R. Backer (State Bar No. 342492)
  kali@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile:  (415) 449-6469

*Attorneys for Claimant*

# EXHIBIT C



Western Case Management Center
45 E River Park Place West
Suite 308
Fresno, CA 93720
Telephone: (877)528-0880
Fax: (855)433-3046

November 13, 2024

Seth A. Safier, Esq.
Gutride Safier LLP
100 Pine Street
Suite 1250
San Francisco, CA 94111
Via Email to: Seth@gutridesafier.com

Edward D. Totino, Esq.
Baker McKenzie LLP
10250 Constellation Boulevard
Suite 1850
Los Angeles, CA 90067
Via Email to: edward.totino@bakermckenzie.com

Case Number: 01-23-0005-7588

Vishal Shah
-vs-
Constellation Brands, Inc.

Dear Parties:

This letter acknowledges Arbitrator Handsher issued a Ruling on October 2, 2024 dismissing this matter. Therefore, on October 8, 2024, the American Arbitration Association (AAA) reviewed and finalized the billing for this matter and closed this case as Withdrawn.

Please note that the AAA WebFile® ECF Guidelines will not apply after the closing of the case. Therefore, any additional submissions from the parties in this matter should be submitted via email to the AAA, with copies sent to all other parties.

We thank Arbitrator Handsher, who is receiving a copy of this correspondence, for serving on this matter.

Pursuant to the AAA's current policy, in the normal course of our administration, the AAA may maintain certain electronic case documents in our electronic records system. Such electronic documents may not constitute a complete case file. Other than certain types of electronic case documents that the AAA maintains indefinitely, electronic case documents will be destroyed 18 months after the stated closing date.

Thank you for choosing the AAA to administer your arbitration.

Sincerely,
/s/
Christina Negrete
Manager of ADR Services
Direct Dial: (559)475-6265
Email: ChristinaNegrete@adr.org
Fax: (855)433-3046

Supervisor Information: *Donna Martinez, Director of ADR Operations, (559) 490-1881,*

*DonnaMartinez@adr.org*


cc:
Nada Hitti
Kali R. Backer, Esq.
Marie A. McCrary, Esq.
Todd Kennedy, Esq.
Christine von Seeburg, Esq.
Carmen M. Ayala
Andreas Moffett
Andrew Yu-Chih